[No. B029952. Second Dist., Div. Seven. June 4, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
RALPH JACOBO, Defendant and Appellant.

**COUNSEL**

Stephen B. Krimel, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, Linda C. Johnson and Juliet H. Swoboda, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

WOODS (Fred), J.—A jury convicted appellant of first degree murder (Pen. Code,[1] § 187) and robbery (§ 211). It also found true a robbery special circumstance (§ 190.2, subd. (a)(17)) and two firearm use allegations (§ 12022.5). We find that: appellant's confessions were properly admitted; no prejudicial error occurred at trial in using restraints on appellant; there was no need to hold a competency hearing; appellant was not denied effective assistance of counsel; the trial court was presumptively aware of its authority to strike the special circumstance finding. We affirm.

### FACTUAL BACKGROUND

There being no insufficiency of evidence claim, we synopsize the evidence with a view favoring the judgment. (*People* v. *Woodberry* (1970) 10 Cal.App.3d 695, 699 [89 Cal.Rptr. 330]; *Buckert* v. *Briggs* (1971) 15 Cal.App.3d 296, 299 [93 Cal.Rptr. 61].) Other facts, as they relate to claimed errors, will be later discussed.

On April 23, 1986, about 9 p.m., Gregory Kuskoski (victim) and his friend Joe Alvarez left work in the victim's pickup truck. They drove to an El Monte residence to buy some marijuana. Joe went inside, leaving his wallet, bookbag and other possessions in the truck, and the victim waited outside.

While the victim was waiting he saw appellant walking toward the truck. He asked appellant if he had marijuana to sell. Appellant said no but the victim persisted. Appellant became angry. At gunpoint, he forced the victim to the passenger side of his truck, he got into the driver's side, and drove off. He stopped near a local high school, ordered the victim out and onto the ground, put the gun to his temple and fatally shot him.

About seven hours later, on April 24 at approximately 5:20 a.m., the victim's body was discovered laying in a residential complex parking area.

Later that day, April 24, appellant went to a local boy's club he frequented and dumped some of the property he had taken from the victim's truck, including Joe's bookbag and wallet.

Late that night, around midnight April 24, appellant, still driving the victim's truck, went to a female friend's house and gave her the murder weapon to hide. They then went for a drive. After about five minutes they

---

[1]Unless otherwise noted all statutory references are to the Penal Code.

saw they were being followed by a sheriff's car. Appellant made a quick turn, stopped, his female friend got out and walked away, and appellant shifted to the passenger side and waited.

Officers, knowing the truck belonged to the murder victim, arrested appellant. Appellant's female friend was not apprehended and went home.

About 10 hours later, on April 25 at approximately 10 a.m., two sheriff's detectives and appellant's probation officer met with appellant in an El Monte jail interview room. Appellant was advised of and waived his *Miranda* rights. He initially denied committing the murder. The two sheriff's detectives left the room and within 5 to 10 minutes appellant told his probation officer he had shot the victim and had given the weapon to his female friend. The probation officer told the detectives. The female friend was contacted and within the hour gave the murder weapon to the authorities.

The detectives then readvised appellant of his rights. Appellant waived his rights and again confessed. The detectives then tape recorded another confession from appellant.

Around noon on this same day, April 24, an El Monte police officer recovered from the boy's club trash can the property appellant had dumped there, property from Joe and the victim.

Appellant did not testify and no defense witnesses were called.[2]

### CONTENTIONS

Appellant contends:

1. The trial court erred in failing to suppress his confessions.

2. The trial court erred in having restraints placed on appellant during trial.

3. The trial court erred in not holding a competency hearing.

4. He was denied effective assistance of counsel.

---

[2]Appellant did testify at a pretrial hearing (Evid. Code, § 402) and the defense did call, out of order during the prosecution's case-in-chief, the El Monte officer who recovered the property from the boy's club.

5. The trial court was not aware it had discretion to dismiss the special circumstance finding.

## DISCUSSION

1. *Appellant contends the trial court erred in failing to suppress his confessions.*

Appellant urges two reasons the trial court should have suppressed his confessions. ██ The first is that the *Miranda* (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) advisements "were inadequate because appellant was never told by the detectives, or by Tooley [appellant's probation officer], that what appellant said to Tooley could be used against him."

Appellant relies on *People* v. *Bennett* (1976) 58 Cal.App.3d 230 [129 Cal.Rptr. 679] and *People* v. *Quirk* (1982) 129 Cal.App.3d 618 [181 Cal.Rptr. 301].

In *People* v. *Bennett* police suspected the defendant murdered his missing wife. They advised him of his rights, he waived his rights, and denied involvement. Six weeks later, without any further advisement or waiver, a police psychiatrist questioned defendant. His statements were admitted without a pretrial hearing.

In reversing the conviction *Bennett* stated: "It is clear that subsequent statements by a defendant without *Miranda* warnings are nonetheless admissible upon a judicial finding that a prior adequate warning was given 'within a reasonably contemporaneous period of time.'" (*People* v. *Bennett, supra,* 58 Cal.App.3d 230, 238.) *Bennett* held that six weeks was not "a reasonably contemporaneous" period of time.

In *People* v. *Quirk, supra,* 129 Cal.App.3d 618, it was also a police psychiatrist who elicited the inculpatory statements from the defendant. The defendant had been arrested, *Mirandized,* and waived his rights. Three days later, while still in jail, a police psychiatrist visited him. At the outset, defendant asked if his wife had hired an attorney for him. He stated that he wanted one. Thereafter the psychiatrist obtained incriminating statements from him.

In reversing the conviction, *Quirk* held that defendant had invoked his *Miranda* rights and that three days, in the instant circumstances, was not "a reasonably contemporaneous period of time." (129 Cal.App.3d at p. 632.)

*Bennett* and *Quirk* are distinguishable. Unlike both cases, the person who obtained appellant's confession, his probation officer, was present when appellant was advised of his rights. The advising officers told appellant that his probation officer "was there assisting us in the investigation of a murder." Two to four minutes later, when the probation officer was alone with appellant, he "told him I wanted him to understand whose side I'm on. I'm on the side of the law enforcement. And I was assisting them in the investigation." The probation officer was "certain that [appellant] knew that I, whatever he told me I was going to tell the detectives."

Within a few minutes appellant confessed.

Appellant testified at the pretrial hearing to determine the admissibility of his confessions. He conceded that he had been advised of his rights, that he understood his rights, waived his rights, that no promises had been made to him, and that he had voluntarily talked to his probation officer. He did *not* claim that he thought his statements to his probation officer could not be used against him.

Under these circumstances the prior advisement was "within a reasonably contemporaneous period of time" and no further advisement by the probation officer was required. (*People* v. *Bynum* (1971) 4 Cal.3d 589, 600 [94 Cal.Rptr. 241, 483 P.2d 1193], overruled on other grounds by *People* v. *Williams* (1976) 16 Cal.3d 663, 669 [128 Cal.Rptr. 888, 547 P.2d 1000] [30- to 40-minute delay was a "reasonably contemporaneous period of time"]; *People* v. *Meneley* (1972) 29 Cal.App.3d 41, 58 [105 Cal.Rptr. 432] [15-minute delay was a "reasonably contemporaneous period of time"].)

■ Appellant's second reason for urging that his confessions should have been suppressed is they "were the product of psychological coercion."

■ In reviewing this claim we are mindful that the prosecutor must prove a confession voluntary by a preponderance of the evidence (*People* v. *Markham* (1989) 49 Cal.3d 63, 65, 71 [260 Cal.Rptr. 273, 775 P.2d 1042]); that a reviewing court independently examines uncontradicted evidence but as to conflicting evidence, it must accept the version favorable to the People, if supported by the record. (*People* v. *Howard* (1988) 44 Cal.3d 375, 394, 398 [243 Cal.Rptr. 842, 749 P.2d 279].) ■ Further, "in cases of claimed psychological coercion [the question] is whether the influences brought to bear upon the accused were such as to overbear [his] will to resist and bring about confessions not freely self-determined. [Citations.] In determining whether or not an accused's will was overborne an examination must be made of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*People* v. *Thompson*

(1990) 50 Cal.3d 134, 166 [266 Cal.Rptr. 309, 785 P.2d 857].) (Internal quotations omitted.)

In asserting coercion, appellant cites these four circumstances: 1. he was 18 years old; 2. his I.Q. was 70; 3. he had never been in serious trouble with the law; 4. his probation officer was acquainted with him and exploited his [appellant's] counselling experiences. The first three circumstances are not part of the pretrial hearing record[3] and thus we may not consider them. (*Loving and Evans* v. *Blick* (1949) 33 Cal.2d 603, 613-615 [204 P.2d 23]; *Pulver* v. *Avco Financial Services* (1986) 182 Cal.App.3d 622, 631-632 [227 Cal.Rptr. 491]; 9 Witkin, Cal. Procedure (3d ed. 1985) § 250, pp. 256-257.)

As to the fourth, the testimony consists of the following:

"Q. [By prosecutor] What did you tell him?

"A. [By probation officer] We just started talking about—we knew each other for awhile. We started talking about—he had been in three separate counseling situations, talking about what they were trying to teach him and what he was to get out of that and the importance of being responsible for what you do and not take responsibility for what someone else does, and things along those lines.

"Q. And did you continue to talk to him about basically the counseling you [*sic*] had been in?

"A. Yes, the counseling, yes.

"Q. At some point did he stop you?

"A. Yes.

"Q. Were you still talking at that time?

"A. It was—I was interrupted.

"Q. And what did he say when he interrupted you?

"A. He says, 'Okay, Tooley. I'm going to tell you. I killed him.' "

---

[3]At the pretrial hearing the probation officer testified he had not been aware of appellant being given an I.Q. test. The probation officer also testified to appellant's prior use of drugs. Neither he nor any other pretrial hearing witness attempted to describe appellant's complete criminal record.

We find nothing coercive in these remarks. " '[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' " (*People* v. *Howard, supra,* 44 Cal.3d 375, 398.) The probation officer, in advising appellant to be responsible for what he had done, advised no more than that he tell the truth. He didn't even imply "it would be *better*" for him if he did so. No threats or promises were made. Finally, appellant did not testify to any undue influence or suggest his will was overborne. In fact, he testified that he voluntarily talked to his probation officer.

*People* v. *Adams* (1983) 143 Cal.App.3d 970 [192 Cal.Rptr. 290], relied upon by appellant, is distinguishable. There, a woman suffering from asthma, who was " 'just short of crying' " (*id.* at p. 985), was told "she was a candidate for a nervous breakdown because she would not tell the truth" (*id.* at p. 988), and that she "would be consumed with guilt because she had sinned and refused to conform to God's law." Her interrogator was a "friend" and fellow church member, the sheriff.

We conclude the trial court properly admitted appellant's confessions.

2. *Appellant contends the trial court erred in having restraints placed on appellant during trial.*

In the words of the trial court: "The record should reflect that about 10 minutes ago, while the jury was beginning to file into the courtroom, that Mr. Jacobo [appellant] threw a [p]unch and hit Mr. Artis, his attorney. There was a nose bleed. There was a scuffle in the courtroom. Mr. Smith, the bailiff, subdued Mr. Jacobo in an apparent escape attempt."

The jury was discharged and the court ordered that appellant "be chained, both hand and foot, so we'll have no repeat of this incident." The next day, Mr. Artis's motion to be relieved as appellant's attorney was granted.

A week later, on June 23, 1987, and just before the instant trial began, appellant's new trial attorney made a motion to have the restraints removed from appellant.

At the hearing on the motion the prosecutor represented that appellant had a pending felony assault case arising from his attack on another prisoner, while in custody. The prosecutor also stated that appellant's attack on Mr. Artis was "unprovoked."

Before ruling the court remarked:

"[W]hat has been described to me by everybody in the courtroom, there was an absolutely unprovoked attack on Mr. Artis . . . .

"When I stepped in the courtroom after the incident, there was blood all over Mr. Artis and on the floor.

"I thought for a moment his nose might have been broken.

"I'm not sure it was for the purpose of a delay or an attempt to escape. But I'm satisfied that whatever point that Mr. Jacobo wishes to make at any point during the proceedings, he is not adverse [*sic* ] to using violence.

"And out of respect for counsel at the table and the whole process, I'm going to require that he be restrained."

■ Appellant claims the trial court erred because it heard no evidence and failed to consider "less prejudicial means of preserving courtroom security."

We disagree. The trial court was virtually percipient to appellant's attack on Mr. Artis and was entitled to consider what he himself had observed. Although no evidence was offered at the hearing, appellant was not denied an opportunity to present evidence. Absent any objection to the prosecutor's representations, the court was entitled to consider them.

Although "shackling is to be employed only as a last resort, based on 'a showing of manifest need for such restraints' " (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 94-95 [270 Cal.Rptr. 817, 793 P.2d 23]), a "court's shackling decision cannot be successfully challenged on review except on a showing of a manifest abuse of discretion." (*Id.* at p. 95; internal quotations omitted; accord *People* v. *Sheldon* (1989) 48 Cal.3d 935, 945 [258 Cal.Rptr. 242, 771 P.2d 1330].)

Appellant has shown no such abuse of discretion. As *People* v. *Duran*, the leading case on shackling, states: "An accused may be restrained, for instance, on a showing that he plans an escape from the courtroom or that he plans to disrupt proceedings by nonviolent means." (*People* v. *Duran* (1976) 16 Cal.3d 282, 292, fn. 11 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].) The trial court was entitled to conclude that appellant had done more than "plan" an escape or a disruption, he had *attempted* an escape and accomplished a disruption.

Finally, the words of *People* v. *Zatko* (1978) 80 Cal.3d 534 [145 Cal.Rptr. 643], are dispositive of appellant's contention: "[T]here is nothing in the record to indicate that the jury was even aware of the physical restraints.[4] 'It is elementary that the function of an appellate court, in reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the record of trial proceedings . . . ." (*People* v. *Zatko, supra,* 80 Cal.App.3d 534, 551.)

3. *Appellant contends the trial court erred in not holding a competency hearing.*

■ If the trial judge entertains a "doubt" concerning the mental competence of the defendant he must suspend criminal proceedings and conduct a competency hearing. (§ 1368.) Even if the trial judge does not entertain such a doubt, when there is substantial evidence of defendant incompetency, a competency hearing is mandatory. (*People* v. *Deere* (1985) 41 Cal.3d 353, 357-358 [222 Cal.Rptr. 13, 710 P.2d 925], disapproved on other grounds by *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1228, fn. 9 [259 Cal.Rptr. 669, 774 P.2d 698].) However, "[e]vidence that merely raises a suspicion that the defendant lacks present sanity or competence but does not disclose a present inability because of mental illness to participate rationally in the trial is not deemed 'substantial' evidence requiring a competence hearing. [Citations.] '[M]ore is required to raise a doubt [of competence] than mere bizarre actions or bizarre statements . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense . . . ." (41 Cal.3d at p. 358.)

■ Appellant claims the trial court knew the following information and that it constitutes substantial evidence of incompetence: appellant had a long history of PCP use; despite not having a violent background he allegedly killed someone without knowing why; he struck his attorney in court; he had an I.Q. of 70; he stated he did not understand the proceedings and had not been listening to them; despite the advice of his counsel and the court, he failed to testify.

The claim is both factually and legally in error. As to appellant's use of PCP, several witnesses testified appellant was *not* under the influence of a

---

[4]Counsel for appellant cites no instance of such jury awareness and we have found none. The augmented record containing jury voir dire fails to disclose any reference to the restraints. We also note that at the June 24, 1987, pretrial hearing appellant was described as wearing a *long sleeve* tan shirt and when, later that day, he was introduced to the jury he was, and remained, seated. As we have previously observed, appellant did not testify at the trial and thus did not walk from the counsel table to the witness box.

drug on April 24 and 25, 1986. There was no evidence that in the ensuing 14 months, when appellant was in custody awaiting trial, he used PCP. Appellant did give a reason for killing the victim: he became angry when the victim persisted in asking him about marijuana. Only appellant's probation officer testified about appellant's I.Q. and he believed it was in the 70's, and didn't know if it was high or low 70's. Although, in an in camera proceeding, appellant stated he didn't understand the proceedings, the trial judge disbelieved him. The judge told him "I know you do understand. You say you don't. You said earlier you do. Now you say you don't. [¶] You continue to play games, Mr. Jacobo . . . ."

Not mentioned by appellant are the numerous colloquies the court had with appellant nor appellant's pretrial hearing testimony. The record demonstrates that on all these occasions appellant was responsive and articulate. It is also pregnant that none of the three attorneys, who at different times represented appellant below, ever suggested to the trial court that appellant might be incompetent.

We find there was no substantial evidence of appellant incompetence. The trial court had no duty to conduct a competency hearing.

4. *Appellant contends he was denied effective assistance of counsel.*

■ A claim of denial of effective assistance of counsel has two components. "First, [appellant] must show that counsel's performance was deficient; specifically, he must establish that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. Second, he must establish prejudice. He must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome [citations]. Defendant has the burden of proving an ineffective assistance claim by a preponderance of the evidence [citations]." (*People* v. *Plager* (1987) 196 Cal.App.3d 1537, 1542-1543 [242 Cal.Rptr. 624].)

Counsel, to be effective, must investigate all factual and legal defenses. If counsel's failure to do so causes the withdrawal of a potentially meritorious defense, a defendant has been denied effective assistance of counsel. (*People* v. *Pope* (1979) 23 Cal.3d 412, 424-425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

But in reviewing defense counsel's trial tactics courts must be cautious. "It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining

counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [80 L.Ed.2d 674, 694, 104 S.Ct. 2052].)

Appellant prefaces his denial of effective assistance of counsel contention with what may be described as *criticism* rather than legally cognizable argument. His brief states:

"The facts demonstrate that appellant was denied effective assistance of counsel as a direct result of the trial court's insistence that the case proceed immediately to trial.

"Appellant's trial counsel, John Tyre, was appointed to the case only six days before the commencement of trial. Appellant objected, questioning how his attorney could possibly prepare in less than a week. The court ruled that 'that's adequate time for him to be prepared and ready to go.' "

We note that appellant does *not* claim trial court error in setting the trial date.

Unmentioned by appellant are: 14 months elapsed from crime to trial; 12 months from preliminary examination to trial; appellant was continuously represented by counsel; appellant requested and obtained numerous trial continuances for "further preparation"; appellant's second attorney had over 5 months to prepare for trial and indicated he was ready for trial on June 10, 1987; appellant, in addition to counsel, had an investigator, and trial counsel for appellant apparently had an assistant; the prosecution's case lasted less than 2 days; appellant's trial counsel, prior to trial stated, "For the record, also I would indicate at this time I am ready for trial."

Appellant's argument is this: trial counsel failed to do but could and should have done the following: present evidence of appellant's mental capacity and adjustment problems at the pretrial hearing; present evidence of appellant's incompetency to stand trial; cause appellant to testify at trial; present expert evidence at the sentence hearing.

The argument is an invitation for us to do what we cannot do: "second guess counsel's assistance after conviction." (*Strickland* v. *Washington*, *supra*, 466 U.S. 668, 689 [80 L.Ed.2d 674, 694].)

" 'In some cases . . . the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide

one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.' " (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 218 [233 Cal.Rptr. 404, 729 P.2d 839].)

The record[5] fails to support appellant's contention he was denied effective assistance of counsel.

5. *Appellant contends the trial court was not aware it had discretion to dismiss the special circumstance finding.*

Appellant, utterly without support in the record, contends the trial court was not aware it had discretion to dismiss the special circumstance finding. (*People* v. *Williams* (1981) 30 Cal.3d 470, 490 [179 Cal.Rptr. 443, 637 P.2d 1029].)

■ " 'It is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties.' " (*People* v. *Lewis* (1987) 191 Cal.App.3d 1288, 1296 [237 Cal.Rptr. 64].)

The contention is without merit.

### DISPOSITION

The judgment is affirmed.

Lillie, P. J., concurred.

JOHNSON, J.—I concur in the judgment. I regard this as a razor thin case on the admissibility of appellant's statement to his probation officer. I concur solely because I am convinced there is substantial evidence supporting the

---

[5]In some respects the record is unusually illuminating. In camera, absent the prosecutor, trial counsel explained why he didn't call drug expert Dr. Ronald Segal: Dr. Segal had concluded appellant was *not* under the influence of PCP when he shot the victim. In camera, absent the prosecutor, trial counsel informed the court he had strongly advised appellant to testify but appellant refused to do so. The court listened to a tape recording of counsel's advice to appellant. To preserve attorney-client confidentiality, the recording was retained by trial counsel and not made a court exhibit. It is not part of the record on appeal.

conclusion the probation officer made it clear to appellant he had shifted roles and was allied with law enforcement before appellant uttered the damaging admissions. The issue remains razor thin because of appellant's intellectual limitations. Conceivably, this warning did not register at all or evaporated from his memory before he and the probation officer began conversing about the crime. Yet I cannot say substantial evidence is lacking to support the opposite inference.